IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FIDELITY & DEPOSIT COMPANY OF MARYLAND and ZURICH AMERICAN INSURANCE COMPANY<br><br>    Plaintiffs,<br><br>v.<br><br>TEXAS EASTERN TRANSMISSION, LP,<br><br>    Defendant. | § § § § § § § § § § § § | Civil Action No. 3:16-cv-3303 |

## ORIGINAL COMPLAINT

Fidelity & Deposit Company of Maryland and Zurich American Insurance Company complain of Texas Eastern Transmission, LP as follows:

## I.
## PARTIES

1. Plaintiff Fidelity & Deposit Company of Maryland ("F&D") is a Maryland corporation incorporated pursuant to the laws of the State of Maryland with its principal place of business in Illinois.

2. Plaintiff Zurich American Insurance Company ("Zurich") is a New York corporation incorporated pursuant to the laws of the State of New York with its principal place of business in Illinois.

3. Defendant Texas Eastern Transmission, LP ("Texas Eastern") is a Delaware Limited Partnership with its principal place of business in Texas and may be served with process by serving its registered agent for service of process, CT Corporation System, at 1999 Bryan St., Suite 900, Dallas, Texas 75201. Texas Eastern's general partner is Spectra Energy Transmission Services, LLC. The sole

owner/member of Spectra Energy Transmission Services, LLC, is Spectra Energy Transmission, LLC. The sole member of Spectra Energy Transmission, LLC, is Spectra Energy Capital, LLC. Spectra Energy Capital, LLC, is wholly owned by Spectra Energy Corp. Texas Eastern's limited partner is Spectra Energy Transmission Resources, LLC. The sole owner/member of Spectra Energy Transmission Resources, LLC, is Spectra Energy Transmission, LLC. All the above-referenced Limited Liability Companies and their respective owners/members are Delaware entities with principal places of business in Texas. None of these entities are citizens of Maryland, New York, or Illinois.

## II.
## JURISDICTION

4. This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332 in that this is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## III.
## VENUE

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) as Texas Eastern both reside in the Northern District of Texas for purpose of venue.

## IV.
## FACTUAL BACKGROUND

6. Texas Eastern is a limited partnership that engages in the interstate transportation and storage of natural gas. Texas Eastern owns and operates natural gas pipelines that connect natural gas sources in Texas and the Gulf Coast with markets in the northeastern United States.

7. In the fall of 2014, Texas Eastern accepted bids from numerous pipeline construction companies for the installation of a 30-inch natural gas pipeline in Monroe,

Belmont, and Jefferson Counties, Ohio (the "Project"). Sheehan Pipe Line Construction Company ("Sheehan") was one of approximately ten bidders on the Project.

8. Sheehan was not only the low bidder, Sheehan's bid was grossly lower than the next lowest bidder. Texas Eastern knew that Sheehan's bid price was inadequate. Sheehan now estimates that it had underbid the Project by as much as $40,000,000.00. Although Texas Eastern knew Sheehan had missed the mark, rather than addressing the woefully inadequate bid with Sheehan as it should have, Texas Eastern took further advantage of the situation. It suggested to Sheehan that Sheehan had actually *overbid* the job and pressured Sheehan to lower its already grossly low unit price for the mainline installation before it would award Sheehan the work. Sheehan did so, and on or about January 22, 2015, Texas Eastern—acting by and through its general partner, Spectra Energy Transmission Services, LLC—entered into a written contract (the "Contract") with Sheehan to perform the work required for the Project.

9. Although knowing Sheehan had unwittingly provided an egregiously low bid for the Project, cementing a significant if not catastrophic loss to Sheehan and substantially increasing the probability of Sheehan's default, Texas Eastern was apparently unconcerned because it had required Sheehan provide payment and performance bonds on the Project. F&D and Zurich (collectively "Surety"), unaware of the substantial underbid, issued payment and performance bonds, both numbered 09120121, in the penal sum of $82,257,083.00 (collectively the "Bonds"). Of course Texas Eastern did not properly disclose the fact that Sheehan's bid was obviously far too low. Had Texas Eastern not concealed Sheehan egregious underbid, Surety would never have issued the Bonds.

10.     Further exacerbating the certain loss Sheehan would suffer as a result of its bid, Texas Eastern staffed the project with an obviously incompetent management team and unreasonable environmental inspector. Rather than taking reasonable steps to assist successful completion, Texas Eastern's management team mismanaged the Project, focusing on unnecessary minutiae and requiring Sheehan to spend additional time and resources chasing trivialities not relevant to the overall goals of the Project. Further, Texas Eastern failed to maintain stock and ensure timely delivery of induction bends necessary for completion. It was incumbent on Texas Eastern to coordinate access to and delivery of induction bends in a timely and efficient manner. This was particularly important given the topography and steep slopes where the pipeline would be placed, requiring Sheehan to install many more induction bends than were contemplated by the scant design provided by Texas Eastern. Sheehan implored Texas Eastern's management team to make induction bends available in a timely, offering to make necessary modifications onsite in order to get induction bends on the job quickly, but Texas Eastern failed to do so.  Texas Eastern's failure to provide induction bends in a timely manner resulted in numerous disruptions and excessive and duplicative labor and other costs that could not have been foreseen by Sheehan.

11.     In addition, Texas Eastern's environmental inspector, with the support of Texas Eastern's management team, held Sheehan to a standard of compliance far above and beyond industry standards. Although Texas Eastern apparently acknowledged the problem, they refused to take appropriate action. For example, in areas where equipment crosses bridges over streams and creeks, industry standard requires that the bridges be cleaned at the end of each day. Texas Eastern's inspector,

however, required *each bridge* to be cleaned after *each crossing*. These and other unreasonable requirements imposed by the inspector resulted in substantial cost overruns and delays, making Sheehan's work on the Project substantially more expensive than comparable work Sheehan had performed on earlier phases of the pipeline supervised by a competent environmental inspector. The unreasonable and unnecessary interference by Texas Eastern's environmental inspector forced Sheehan to maintain a work force much larger than would typically be required to address his unreasonable whims.  The incompetent management of the Project and rogue environmental inspector further amplified the consequences of Sheehan's inadequate bid, sealing Sheehan's ultimate default and resulting bankruptcy.

12.     Texas Eastern failed to properly recognize and pay for compensable costs outside the scope of the Contract, many of which were caused by its inadequate management and design, forcing Sheehan to unjustly bear the financial burden of extra work Sheehan was required to perform. More specifically, Sheehan installed at least 155 more induction bends than were depicted on the drawings, for which it was entitled to an additional $3,875,000.00. The downtime for crews waiting on induction bends and constantly remobilizing to other locations resulted in an additional $3,350,000.00 in expenses to which Sheehan was entitled. In addition, Sheehan was entitled to an additional $286,275.00 for the application of Flexterra, a specialized erosion-control material applied in areas that were inaccessible for traditional seeding. Finally, Sheehan was entitled to an additional $3,936,139.81 for costs associated with unreasonable requirements of Texas Eastern's environmental inspector. Texas Eastern wrongfully refused to approve payment for these additional unanticipated costs. Given Sheehan's

_____
**PLAINTIFFS' ORIGINAL COMPLAINT**                                                                                                           **PAGE 5**
8465868.11/SP/33310/0731/112816

unreasonable bid price, Texas Eastern's failure to properly pay for such extra costs effectively starved Sheehan. Surety is subrogated and has been expressly assigned Sheehan's rights to such additional compensation.

13.     Texas Eastern's plans and specifications for the Project were also inadequate and failed to properly address slope stability of the surface material. Certain measures, including the installation of drain tiles, were available to mitigate instability, albeit as an additional pay item requiring the approval of Texas Eastern. Texas Eastern directed Sheehan to install a very limited number of those drain tile systems during the beginning of the Project, but shortly thereafter elected not to require Sheehan to install any more, presumably to avoid the relatively minor additional costs. As a result of the inadequate design and Texas Eastern's decision not to install drain tile systems, Sheehan was forced to repeatedly address slope slides. The Project has continued to experience slope failure to this day as a result of Texas Eastern's inadequate design and decision not to utilize the drain tile systems on significant slopes.

14.     In addition to mismanagement of the Project, unwillingness to approve change orders, and deficient design, Texas Eastern materially violated the terms of its own contract by making payments to Sheehan without requiring waivers and/or releases of liens from Sheehan's subcontractors. Section 7.2(e) of the Contract required that Texas Eastern obtain waivers and releases of liens and security interests from any subcontractor in excess of $100,000.00 as "a condition precedent to any payment to Contractor." Nonetheless, Texas Eastern made substantial payments without requiring properly executed lien waivers and releases. To the extent that Texas Eastern received "lien waivers" at all, the so-called "lien waivers" received made clear that the

subcontractors had not been paid for work performed. Nonetheless, rather than addressing the fact that Sheehan had failed to provide appropriate lien waivers and releases and refusing to release the Contract balances given that an express condition precedent had not been met, Texas Eastern ignored the express language of the Contract and knowingly made the payments to Sheehan. The release of funds in violation of the express terms of the Contract, upon which Surety had relied when issuing the Bonds, was clearly prejudicial to Surety, materially increasing its risk under the Bonds. Texas Eastern's conduct allowed Sheehan to continue down an unsustainable path without addressing the lucid signs of serious financial problems for the Project on the horizon. Surety has paid in excess of $18,000,000.00 for claims made on the Payment Bond, which could have been avoided had Texas Eastern complied with the terms of the Contract and required appropriate lien waivers and releases.

15.     In spite of the numerous significant roadblocks to completion, a certificate of substantial completion was issued for the Project on December 8, 2015. However, the damage to Sheehan had been done. On or about April 15, 2016, Sheehan filed for bankruptcy protection in the Northern District of Oklahoma.

16.     To add insult to injury, Texas Eastern proceeded to make a claim on the Performance Bond. Surety denied such claim based upon Texas Eastern's actions and inaction.  Surety has been discharged from any liability under the Performance Bond as a result of Texas Eastern's wrongful acts describe above.  Further, Texas Eastern is liable to Surety for all payments made by Surety under the Payment Bond and for the

additional amounts owed to Sheehan for costs and expenses for work performed outside the scope of the Contract.

## V.
## COUNT ONE
### BREACH OF EXPRESS OR IMPLIED CONTRACTUAL DUTIES TO SURETY

17. Surety incorporates and realleges the factual allegations in Paragraphs 1-16 above as if fully copied herein.

18. Upon issuance of the Bonds, a tripartite contractual relationship was established between Surety, Texas Eastern, and Sheehan. Surety materially relied on the terms of the Contract when it issued the Bonds and expected Texas Eastern to comply with such terms. Section 7.2(e) of the Contract, upon which Surety relied when issuing the Bond, provides in relevant part:

> As a condition precedent to any payment to [Sheehan] by [Texas Eastern], [Sheehan] must provide [Texas Eastern] with waivers and release of liens and security interests from . . . any Subcontractor that is or should reasonably be expected to charge in aggregate total in excess of $100,000.00 . . . .

19. However, Texas Eastern did not require waivers and releases of liens from Sheehan's subcontractors as a condition precedent to payment. In fact, in the limited instances it did receive purported waivers and releases, they clearly reflected that the subcontractors had not been paid for work performed. Notwithstanding the failure to require such waivers and releases, Texas Eastern released substantial Contract funds to Sheehan. The release of Contract funds without requiring appropriate waivers and releases from Sheehan's subcontractors is a breach of Texas Eastern's express and/or implied contractual duties to Surety, resulting in a discharge of Surety's obligations under the Performance Bond.

20. Not surprisingly, particularly given the financial shortfall created by the grossly inadequate bid, Texas Eastern's mismanagement of the Project, and Texas Eastern's failure to pay for additional work, many of Sheehan's subcontractors were never paid. Instead, those subcontractors made claims against the Payment Bond issued by Surety, resulting in payments by Surety to such subcontractors in date in excess of $18,000,000.00. Therefore, as a result of Texas Eastern's failure to comply with its express and/or implied contractual duties to Surety, Surety has been discharged from its obligations under the Performance Bond and is entitled to recover damages in the amount of at least $18,000,000.00 from Texas Eastern.

## VI.
## COUNT TWO
### RESCISSION AND RESTITUTION

21. Surety incorporates herein by reference each of the allegations contained in Paragraphs 1 through 20 of this Complaint as though specifically alleged herein.

22. Texas Eastern knew that Sheehan had grossly underbid the Project. However, Texas Eastern not only failed to alert Sheehan, it negotiated an even lower price. Texas Eastern knew that Sheehan would never be able to fully complete the Contract for the amount bid without, at best, a significant loss.

23. Texas Eastern was also aware that Sheehan's gross underbid would materially increase the risk of Sheehan's default beyond that which Texas Eastern had reason to believe that Surety intended to assume. Furthermore, Texas Eastern knew that Surety had no knowledge of the substantial underbid and had no reasonable ability to obtain such knowledge. Surety would not have issued the Bonds had it known of the underbid.

24. Texas Eastern had a duty to disclose to Surety the gross underbid of which it was aware. However, Texas Eastern did not disclose the fact that Sheehan had grossly underbid the Project to Surety, even though it had the opportunity to do so. Texas Eastern's nondisclosure of the gross underbid constitutes a material misrepresentation absolving Surety from any liability under the Bonds, and Surety is entitled to recover all damages suffered as a result of issuing the Bonds, including, but not limited to, all amounts paid by Surety under the Payment Bond.

## VII.
## COUNT THREE
### BREACH OF CONTRACT WITH SHEEHAN

25. Surety incorporates and realleges the factual allegations in Paragraphs 1-24 above as if fully copied herein.

26. Sheehan incurred substantial costs and expenses for extra work outside the scope of the Contract to which it was entitled to compensation. Such costs and expenses to which Sheehan was entitled to compensation was at least $11,447,414.80. Texas Eastern wrongfully refused to pay Sheehan for such costs and expenses. Texas Eastern's failure to pay Sheehan for such extra work constitutes a breach of the Contract.

27. Surety is equitably subrogated to and has been expressly assigned Sheehan's right to recover such amounts that Texas Eastern wrongfully refused to pay. Accordingly, Surety is entitled to recover at least the amount of $11,447,414.80 as a result of Texas Eastern's breach of contract.

## VIII.
## COUNT FOUR
### QUANTUM MERUIT/UNJUST ENRICHMENT

28. Surety incorporates and realleges the factual allegations in Paragraphs 1-27 above as if fully copied herein.

29. Sheehan did substantial extra work outside the scope of the base contract. Such extra work was provided by Sheehan for the benefit of Texas Eastern. The value of the labor and material provided by Sheehan for and on behalf of Texas Eastern is at least $11,447,414.80, which was and is a reasonable charge for the labor and material provided.

30. Texas Eastern accepted the labor and material furnished by Sheehan outside the scope of the base contract and knew or should have known that Sheehan expected to be paid for such extra work by Texas Eastern. In the absence of payment by Texas Eastern for such labor and material provided, Texas Eastern will be unjustly enriched.

31. Surety is equitably subrogated to and has been expressly assigned Sheehan's right to recover such amounts that Texas Eastern refused to pay. Therefore, Surety is entitled to recover from Texas Eastern the sum of at least $11,447,414.80, pursuant to the doctrines of quantum meruit and/or unjust enrichment.

## IX.
## COUNT FIVE
### ATTORNEYS' FEES

32. Surety incorporates and realleges the factual allegations in Paragraphs 1-31 above as if fully copied herein.

33. Demand has been made upon Texas Eastern for damages resulting from Texas Eastern's wrongful acts and omissions complained of herein. However, despite

demand, Texas Eastern has failed and refused to pay the amount owed. As a result, Surety has been compelled to engage the law firm of Strasburger & Price, LLP, to bring this action against Texas Eastern. Surety is entitled to recover from Texas Eastern all reasonable attorneys' fees incurred in the prosecution of this suit, and, if necessary, appeal.

## X.
## COUNT SIX
### COSTS AND INTEREST

34. Surety incorporates and realleges the factual allegations in Paragraphs 1-33 above as if fully copied herein.

35. Surety is entitled to recover from Texas Eastern all costs of court plus pre-judgment and post-judgment interest at the maximum legal rate allowed by law.

## XI.
## CONDITIONS PRECEDENT

36. All conditions precedent to Surety's entitlement to assert the claims and causes of action asserted herein have occurred or have been satisfied, waived, or excused.

WHEREFORE, Surety requests that Texas Eastern be cited to appear and answer and, upon final hearing or trial, that the Court enter judgment against Texas Eastern in favor of Surety, awarding Surety all actual and consequential damages resulting from Texas Eastern's wrongful acts and omissions, along with all attorneys' fees incurred by Surety through the time of trial, pre- and post-judgment interest at the maximum amount allowed by law, costs, and granting Surety such other and further relief at law or in equity to which Surety is justly entitled.

Respectfully submitted,

/s/ Christopher R. Ward
CHRISTOPHER R. WARD
State Bar No. 24008233
christopher.ward@strasburger.com
BENJAMIN L. WEIBLE
State Bar No. 24068834
ben.weible@strasburger.com
STRASBURGER & PRICE, LLP
2600 Dallas Parkway, Suite 600
Frisco, Texas 75034
Telephone: (214) 651-4722
Facsimile: (214) 659-4608

ATTORNEYS FOR PLAINTIFFS
FIDELITY & DEPOSIT COMPANY OF
MARYLAND AND ZURICH AMERICAN
INSURANCE COMPANY